In re William S. CALLISTER, dba Callister & Sons Trucking, and Gloria K. Callister, Debtors.

Bankruptcy No. 80–02605.

United States Bankruptcy Court, D. Utah.

Nov. 20, 1981.

David E. Leta, Gary F. Kennedy, Roe & Fowler, Salt Lake City, Utah, for debtor.

Elaine England, Richman & Wright, Salt Lake City, Utah, for unsecured creditors committee.

William T. Thurman, McKay, Burton, Thurman & Condie, Salt Lake City, Utah, for Ingersoll-Rand Financial Corp.

Harriet E. Styler, Salt Lake City, Utah, pro se as Trustee.

## MEMORANDUM DECISION

RALPH R. MABEY, Bankruptcy Judge.

### FACTUAL AND PROCEDURAL BACKGROUND

This case raises issues concerning the superpriority provision of 11 U.S.C. Section 507(b).

Debtor, the sole proprietor of a trucking business, filed a petition under Chapter 11 on December 12, 1980. Ingersoll-Rand Financial Corporation (Rand), which holds a security interest in three tractors and two trailers, filed a complaint seeking relief from the automatic stay on January 2, 1981. A hearing was held January 23. At that time, the parties stipulated that the collateral was worth $129,000,[1] that the debt owing was $106,248,[2] and that debtor would pay $1,232 per month beginning February 1 to Rand. Debtor also agreed to insure the equipment as required in the security

---

1. The breakdown in value was as follows: the 1978 Kenworth Cabover tractor, $47,000; the 1977 Kenworth Cabover tractor, $30,000; the 1977 Kenworth Cabover tractor, $30,000; the 1980 Great Dane Flatbed trailer, $12,000; the 1980 Great Dane Flatbed trailer, $10,000.

2. The complaint alleges that, as of January 2, $135,100 was owing. This discrepancy was not explained by the parties.

agreements.[3] A procedure was established for lifting the stay in the event of default.[4] The court ruled that Rand was adequately protected under this arrangement.[5] Two payments were made, but debtor defaulted May 1,[6] and the stay was lifted June 5. The case was converted to Chapter 7 on August 5.[7]

Meanwhile, counsel for debtor filed an application for allowance and payment of fees in the amount of $9,052 under 11 U.S.C. Section 331. Counsel for the unsecured creditors committee likewise requested fees in the amount of $2,994. Rand objected, claiming that the fees might be allowed but not paid because it was entitled to a superpriority under 507(b).[8]

Hearings were held August 18 and 19. The evidence showed that two of the three tractors underwent repair from January to June and therefore conferred no benefit on the estate. The third tractor was used for approximately three weeks but it caught fire and was destroyed. Through inadvertence, no insurance was in force to indemnify this casualty.[9] The trailers were used without mishap.

---

3. The agreements provide: "Debtor warrants, covenants and agrees as follows...To keep the collateral insured on an all-risk basis against all loss or damage and such other hazards as [Rand] may require. Policies shall be in such form and amounts and with such insurance companies as [Rand] may designate or approve; provided, however, that the amount thereof shall be at least equal to the principal. Policies shall be obtained from responsible insurors apprized to do business in the state within which collateral is to be located. Policies of insurance, payable to [Rand] and debtor as their interests may appear, shall be deposited with [Rand] who is authorized, but under no duty, to obtain insurance upon failure of debtor to do so. Each such policy of insurance shall provide that the insurance company shall give [Rand] 30 days prior written notice of the effective date of any alteration or cancellation of such policy. Debtor shall give immediate written notice to [Rand] and to each insuror of loss or damage to the collateral and shall promptly file proofs of loss with each such insuror. Debtor hereby appoints [Rand] as the attorney for debtor in obtaining, adjusting and cancelling any such insurance and endorsing settlement drafts and hereby assigns to [Rand] all sums which may become payable under such insurance, including return premiums and dividends, as additional security for the indebtedness."

4. The procedure, as amended, was as follows: "In the event [debtor] is in default for five (5) days after the first of each month, [Rand] may give notice of default, the notice may be given by mail in which event said notice shall be deemed received three (3) days after mailing, and if said default is not cured within five (5) days by 5:00 p. m. on said fifth day after receiving written notice, [Rand] with proof of notice and default may have an order terminating the stay order without further notice to the [debtor]."

5. The ruling preserved the issue whether "opportunity cost" is an element of adequate protection, but this point was mooted by decision of the court on May 26. *But see infra*, note 35, at 533.

6. The two payments were for February and March. The record does not indicate whether the payment for April was made, and if not, why Rand waited until May to send a notice of default. John Dean, a district manager for Rand, gave notice of default on May 8. Debtor gave Rand a check which was returned for insufficient funds. Rand filed a "Motion for Relief of Stay" and "Affidavit" on May 22 and the order lifting the stay was signed on June 5.

7. The Chapter 7 schedules show $1,980,737 in debt, $657,127 of which is secured debt, and $980,249 in assets. Thus, there are $323,122 in unencumbered assets.

8. Counsel for debtor filed their application for fees on May 15 and it was heard on June 18. Counsel for the unsecured creditors committee filed their application for fees on August 11 and it was heard on September 29. In both instances the fees were allowed but payment was suspended because of the claim for a superpriority.

9. Debtor was accustomed to buying fleet not single truck insurance. Bankruptcy, however, altered his course of dealing. His casualty insurance expired on January 26. His usual carrier, for reasons unclear in the record (but see the motion for turnover filed February 12), did not write a renewal. Faced with the stipulation and a need to change carriers, he contacted the Herbert Stockman Agency. There was a mis-understanding concerning the scope of coverage; debtor believed he had arranged for casualty insurance; the policy was written for liability insurance. Debtor learned of the mix-up when he called to report his claim on the tractor.

Debtor values the collateral, as of June 5, at $89,600.[10] This is the value "as is" without repairs or payment of repair bills. In his view, with the exception of the burned tractor, minimal depreciation has occurred. The decline in value is attributable to the uninsured loss and depression in prices.

Rand values the collateral, as of the same time, and also "as is," at $63,900.[11] In its view, substantial depreciation, independent of the accident, has taken place.

The court values the collateral as of June 5 at $68,900.[12] Subtracting costs of repair in the amount of $7,097[13] leaves $61,803. Hence, the collateral has dwindled in worth by $67,197. At least four factors account for this decrease. The uninsured loss equals $19,411.[14] Error in the stipulation is responsible for $33,447.[15] Market forces caused a loss of $7,993.[16] Use caused a loss of $6,346.[17] Because of the error in the stipulation, the allowed secured claim on January 23 was $95,553, not $106,248. The

10. The breakdown in value is as follows: the 1978 tractor, $38,000 ($37,000 on cross-examination); the 1977 tractor, $29,000; the burned 1977 tractor, $5,000; the trailers, $8,800 each (adding retreads; $9,200 for one trailer with brakes).

11. The breakdown in value is as follows: the 1978 tractor, $30,000; the 1977 tractor, $22,500; the burned 1977 tractor, nothing; one trailer, $6,200; the other trailer, $5,200. These values were given by Robert Hughes, the dealer from whom debtor purchased the equipment. A proof of claim submitted by Rand gives the value at $60,250, minus $6,300 for repairs, or in other words $53,950 (not factoring payments in the amount of $2,464).

12. The breakdown in value is as follows: the 1978 tractor, $30,000; the 1977 tractor, $22,500; the burned 1977 tractor, $5,000; one trailer, $6,200; the other trailer, $5,200.

13. The cost of repairs is difficult to determine. The 1978 tractor and one 1977 tractor were "in the shop" on January 23, and the stipulation assumed that the work was completed and paid. In hindsight, this was not so. Debtor gave the value of the 1978 tractor as of January 23, "as is," at $44,500. Thus, the repairs may have cost $2,500. His testimony on this score varied, however, from $1,500 to $1,800 to $3,900. Hughes testified that an engine overhaul could run as high as $12,000. Dale Rasband, the mechanic who worked on the 1977 tractor, gave the cost of repairs at $4,597. A proof of claim submitted by Rand gives the cost of repairs on both tractors at $6,300, but later memoranda says $4,768. Moreover, no party has suggested to what extent, if costs of repair are treated as an item of loss and deducted, value occasioned by the repair should be added. In light of these conflicting indicators, the court fixes the cost of repairs at $7,097. This is the amount necessary to obtain a release of lien on the tractors; if paid, it would not increase their value.

14. The burned tractor had a stipulated value of $30,000 on January 23. It was worth $5,000 on June 5. The entire difference of $25,000, however, is not attributable to the accident. A

portion, $5,589, is due to the error in the stipulation. See infra note 15, at 4. No share of the loss through market forces is allocated to the burned tractor.

15. The security agreements, executed in June, 1980, show that the equipment was financed for $110,450. It is unclear whether this was the price or whether, and in what amount, a down payment may have been made. Hughes testified that the 1978 tractor was sold for $44,850, the 1977 tractors for $28,750 each, and the trailers for $10,450 each, for a total of $123,250. The equipment was valued by stipulation in January, 1981, after approximately eight months of use, at $129,000. Thus, there was a difference between the Hughes price and the stipulated value of $5,750. Since there was no evidence that this type of equipment appreciates in value, and since an escalation in value is improbable, this amount represents a mistake in the stipulation. But even this amount is understated since it does not account for depreciation through use between June and January. Monthly payments under the security agreements, which are ordinarily keyed to depreciation, were $3,866. This amount, however, includes interest which was per diem $51.38 (this was as of June 17, 1981 and therefore may require adjustment) or for thirty days $1,541. This would make monthly principal payments of $2,325 or for eight months $18,600. (In contrast, the stipulated figure of $1,232 for eight months yields $9,856.) Thus, the mistake in price of $5,750 and depreciation of $18,600 equals $24,350. The stipulated value of $129,000 contained two additional errors. First, it did not account for the cost of repairs at $7,097. Second, it did not account for the value of siding which debtor placed on but later removed from one trailer at $2,000. Cumulative error equals $33,447.

16. This figure is deduced by elimination. It is the difference between the decline in worth of the collateral and all other items of loss.

17. The trailers were the only equipment which depreciated through use. They had a stipulated worth of $22,000 on January 23 and were

allowed secured claim on June 5 was $61,-803, for a reduction of $33,750.

These facts raise several issues which may be classified under the headings of statutory construction, allowance, and rank. Under statutory construction: May a creditor ineligible for an administrative claim under 11 U.S.C. Section 503(b) qualify for superpriority status under 507(b)? Under allowance: Are losses caused by failure to obtain insurance, an error in the stipulation, market forces, and depreciation recompensable under 507(b)? Under rank: Does the superpriority take precedence over interim fees under 331? Under what, if any, circumstances may fees be paid notwithstanding the existence of or potential for a superpriority? These questions are discussed below.[18]

## IS THE SUPERPRIORITY AN ADMINISTRATIVE EXPENSE OR SOMETHING MORE?

The superpriority provision is found in 507(b) which states:

If the trustee, under Section 362, 363, or 364 of this title, provides adequate protection of the interest of a holder of a claim secured by a lien on property of the debtor and if, notwithstanding such protection, such creditor has a claim allowable under subsection (a)(1) of this section arising from the stay of action against such property under Section 362 of this title, from the use, sale, or lease of such property under Section 363 of this title, or from the granting of a lien under Section 364(d) of this title, then such creditor's claim under such subsection shall have priority over every other claim under such subsection.

11 U.S.C. Section 507(a)(1) gives priority to "expenses allowed under Section 503(b)" which include, in part, "the actual, necessary costs...of preserving the estate."[19]

Debtor maintains that only creditors who have claims under 503(b) *and* who lose adequate protection may enjoy the benefit of 507(b). This view draws support from the face of 507(b) which speaks of "a claim allowable under subsection (a)(1) of this section" which in turn refers to 503(b).[20] But

---

valued at $11,400 on June 5 for a difference of $10,600. The entire difference, however, is not attributable to depreciation through use. A portion, $4,254, is due to error in the stipulation. *See supra* note 15, at 4. No share of the loss through market forces is allocated to the trailers.

**18.** The parties have not raised and the court does not reach issues concerning the method and timing of valuation. For example, should adequate protection hearings use going concern values, *see, e. g., In re Alyucan Interstate Corp.,* 12 B.R. 803, 7 B.C.D. 1123, 1129 n. 18 (Bkrtcy., D.Utah 1981), while superpriority hearings use liquidation values, *cf.* Murphy, "Use of Collateral in Business Rehabilitations: A Suggested Redrafting of Section 7–203 of The Bankruptcy Reform Act," 63 Cal.L.Rev. 1483, 1505 (1975)? Should the collateral be valued at the date of the petition, when the complaint is filed, when the hearing is held, or when the decision is rendered? *See, e. g., In re Curlew Valley Associates,* 14 B.R. 506 (transcript of hearing) (Bkrtcy., D.Utah 1981). Likewise, since neither counsel for debtor nor counsel for the unsecured creditors committee has made a request for post-conversion fees, the question whether a superpriority under Chapter 11 outranks costs of administration in a superseding Chapter 7 is not considered.

*Compare, e. g.,* 3 Collier on Bankruptcy ¶ 507.-05 at 507–47 (15th ed. 1980) with P. Murphy, Creditors' Rights In Bankruptcy, Section 7.14 at 7–29—7–30 (1980) and Levit, "Use and Disposition of Property Under Chapter 11 of the Bankruptcy Code: Some Practical Concerns," 53 Am.Bank.L.J. 275, 291–292 (1979).

**19.** Rand has both filed a claim and made a motion for superpriority under 507(b). Filing a claim may be inappropriate. In contrast to 11 U.S.C. Section 502(a) which provides that claims, once filed and absent objection, are deemed allowed, 503(a) and (b), and by analogy 507(b), contemplate the filing of "a request for payment of an administrative expense," which "after notice and a hearing," on certain conditions, may be allowed. *But cf.* 3 Collier on Bankruptcy ¶ 503.02 (15th ed. 1980).

**20.** Rand argues that whether it qualifies for an administrative claim under 503(b) is irrelevant. The use of the trailers, in any event, was probably an actual, necessary cost of preserving the estate. The uninsured loss may likewise fit this category. *Cf. Reading Co. v. Brown,* 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968). *See also infra,* note 20a at 526.

507(b), on closer analysis, is the proverbial prism in the fog. A review of its language, history, and relation to adequate protection, however, may elucidate its meaning.

### The Language of 507(b)

The use of property for the estate creates an administrative claim under 503(b). Curbing repossession of property through the stay, without more, may not lead to the same result. Section 507(b), however, treats property used and property subject to the stay, implying that both, so long as they lose adequate protection, meet the standards of 503(b). Indeed, commentators appear to equate inadequate protection with allowability under 503(b). *See, e. g.,* 3 Collier on Bankruptcy ¶ 507.05 at 507–46 (15th ed. 1980) ("In essence, [507(b)] affords a superpriority to post-petition creditors in whose case the protection given by the trustee is inadequate to protect the creditor's interest *thereby resulting in an administrative expense claim under Section 503(b)(1)(A)*") (emphasis supplied).[20a] The facts, however, may belie this assumption. Here, for example, debtor needed the equipment, but circumstance, for the most part, kept it idle. If the equipment has not been an "actual, necessary cost...of preserving the estate," does it nevertheless qualify as a superpriority because its *use is implicit* in 507(b)?

### History of the Superpriority

The superpriority may be difficult to articulate by statute, because it is equitable in origin and genealogy. The Commission would have permitted the trustee to use collateral subject to a request "to modify the stay by imposing such conditions on the use of the property or the proceeds thereof as will adequately protect the secured party." Report of the Commission on the Bankruptcy Laws of the United States, H.Doc.No.93–137, pt. II, Section 7–203(b)(2) (1973). Granting administrative priority was an appropriate condition "if it is clear that the proceeds of the liquidation of property of the estate available to pay the claim will be sufficient." *Id.* at Note 3.

The authority for this proposal was *In re Yale Express System, Inc.,* 384 F.2d 990 (2d Cir. 1967). In *Yale Express,* the creditor held a security interest in truck bodies and trailers sold to a freight carrier. It sought reclamation of the collateral. The district court, feeling bound by *In re Lake's Laundry, Inc.,* 79 F.2d 326 (2d Cir. 1935), located title to the property in the debtor and denied reclamation. On appeal, the second circuit, noting that the Uniform Commercial Code was " 'well on its way to becoming a truly national law of commerce,' " discarded the " 'barren distinction' " between

**20a.** This conclusion may be based upon the belief that 503(b) is not, in fact, limited to "actual, necessary" costs of administration: "While it is true that the court is not free to fashion additional priorities nor to determine among the priorities the order of payment save as Congress provided for such order, it ought not be assumed that the six designations are necessarily exclusive nor designed to cover every conceivable situation. Thus, the phrase in section 503(b)(1) 'actual, necessary costs and expenses of preserving the estate' should not be thought to preclude a court from determining whether or not a certain claim offered as an expense of administration should not be within the meaning of such phrase. Moreover, the use of the word 'including' as the last word in the lead-in sentence of section 503(b) is not limiting. Section 102, entitled 'Rules of Construction' in subsection (3) states that the words 'includes' and 'including' are not limiting. In short, the use of the word 'including' as a word of non-limitation, suggests that the enumeration by Congress in section 503(b) of what

constitute claims for administrative expenses is not necessarily exclusive and precluding. The court might well conclude that there are to be allowed as administrative expenses claims not necessarily precisely covered by the provisions of section 503(b) itself but which could fall into any of the phrases described in the subsections of section 503(b). Thus, what constitute actual and necessary costs and expenses of preserving the estate might well be open to judicial construction... What is meant, however, by the provisions of section 503(b) is that however a court might construe any of the particular phrases, the court's ultimate determination to allow a claim as an administrative expense is dependent upon the subsections of section 503(b). Unless a claim is allowed as an administrative expense, it is not within this section and, therefore, is not entitled to the priority given such administrative claims by section 507(a)." 3 Collier on Bankruptcy, *supra* ¶ 503.-03 at 503–11—503–12. *But compare id.* ¶ 503.-04(1)(a). *See also supra* note 20, at 6.

conditional sales agreements and chattel mortgages as a basis for reclamation rulings. Instead, "bankruptcy courts should assume their proper equitable function of scrutinizing each petition for reclamation, in order to arrive at a just determination. Equitable considerations and the substance of the transaction should govern, regardless of the form of the security agreement." *In re Yale Express System, Inc.*, 370 F.2d 433, 438 (2d Cir. 1966) (emphasis in original omitted). The case was remanded for a determination whether, in light of these "equitable considerations," the debtor should retain the property. The district court was directed to consider the possibility of rental payments for use of the equipment.

On remand, the district court again denied reclamation and a second appeal followed. A different panel of the second circuit upheld the order because it was "unable to conclude that the court had abused its equitable discretion." *In re Yale Express System, Inc.*, 384 F.2d 990, 992 (2d Cir. 1967). The opinion relied upon findings that the equipment was essential to the business and that reorganization was "not a mere will-o'-the wisp" but a "reasonable possibility." *Id.* at 991. Applications for payment of rent were also denied on the ground that, if the debtor paid rent to this creditor, it would have to pay rent to all which would "nullify the reorganization as effectively as granting the petition for reclamation." *Id.* at 992. As an afternote, the court remarked that it had not "overlooked

[the creditor's] contention that equitable considerations compel a favorable ruling in its behalf because the vehicles in which it claims a security interest are depreciating. *But to such extent as [the creditor] has been damaged by the use of its property pending the reorganization, it is entitled to equitable consideration in the reorganization plan* [citation omitted]." *Id.* (Emphasis supplied.) [21]

*Yale Express* alarmed lenders and they mounted an attack on its codification. One observer wrote that "granting a priority just postpones the day of reckoning until the date of confirmation of the debtor's plan and, in turn, presupposes that a plan will be confirmed." It is, "granting an ephemeral future priority as a device for avoiding present reality." Murphy, "Use of Collateral in Business Rehabilitation: A Suggested Redrafting of Section 7–203 of the Bankruptcy Reform Act," 63 Cal.L.Rev. 1483, 1505 (1975).

Notwithstanding this critique, the concept of an administrative priority as a means of providing adequate protection was written into Section 361(3) of H.R. 8200. *See* H.R. 8200, 95th Cong., 1st Sess. (1977). The House Report cautioned that "this method, more than the others, requires a prediction as to whether the unencumbered assets that will remain if the case is converted from reorganization to liquidation will be sufficient to pay the protected entity in full. It is clearly the most risky, from the entity's perspective, and should be used

---

**21.** The opinion cites *In re New York, New Haven & Hartford R. Co.*, 147 F.2d 40 (2d Cir. 1945) in support of this proposition. In *New York* certain banks were pledgees of stock in subsidiaries of the debtor. The court enjoined sale of the stock. While the case was pending, debtor disaffirmed leases with the subsidiaries which rendered the stock valueless and the banks unsecured. They were classified as such in the plan of reorganization and lodged an objection which was overruled. The second circuit reversed noting: "We do not think this is fair and equitable treatment. The injunction was justified only on the theory that it would benefit the debtor's estate. The damage to the banks resulting from it ought not equitably to be saddled on them but on the parties for whose supposed benefit the restraint was im-

posed, and particularly is this true where the decline in the value of the collateral resulted from an act of the debtor itself. In our opinion fair and equitable treatment requires that the damage caused the banks should be made good to them and that they should be classified as secured creditors to the extent to which they would have realized on their collateral had they not been restrained from selling, and as unsecured creditors only for the amount by which the debts owing them exceed such realizable value of the collateral." *Id.* at 48. One commentator has pointed to the *New York* case, and its insistence on "fair and equitable treatment" as a model for analyzing problems under 507(b). *See* P. Murphy, Creditors' Rights in Bankruptcy, Section 5.19 at 5–22 (1980).

only when there is relative certainty that administrative expenses will be able to be paid in full in the event of liquidation." H.R.Rep.No.95–595, 95th Cong., 1st Sess. 340 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6296.[21a] The Senate disagreed and omitted the concept of an administrative priority as a means of providing adequate protection "because such protection is too uncertain to be meaningful." Sen.Rep.No.95–989, 95th Cong., 1st Sess. 54 (1978), U.S.Code Cong. & Admin.News 1978, p. 5840.

As enacted, Section 361 dropped subsection (3) of H.R. 8200 because "in every case there is the uncertainty that the estate will have sufficient property to pay administrative expenses in full." 124 Cong.Rec. H11,-092 (daily ed., September 28, 1978). Language forbidding use of administrative priorities in fashioning adequate protection took its place. The concept, however, was not entirely abandoned. It was grafted on to 507 so that "to the extent the protection [under Section 361] proves to be inadequate after the fact, the creditor is entitled to a first priority administrative expense." *Id.* Floor leaders commented further that "Section 507(b)...is new and is derived from the compromise contained in the House with respect to adequate protection under Section 361. Subsection (b) provides that to the extent adequate protection of the interest of a holder of a claim proves to be inadequate, then the creditor's claim is given priority over every other allowable claim entitled to distribution under Section 507(a)." *Id.* at 11,095.

### The Superpriority and Adequate Protection

The superpriority is the stepchild of adequate protection and they enjoy a symbiotic relationship. Adequate protection was designed to "mediate polarities" in Chapter 11 and is therefore "not a formula, but a calculus, open-textured, pliant, and versatile, adaptable to 'new ideas' which are 'continu-

ally being implemented in this field' and to 'varying circumstances and changing modes of financing;'" its meaning "is born afresh out of the 'reflective equilibrium' of each decision." *In re Alyucan Interstate Corp.,* 12 B.R. 803, 7 B.C.D. 1123, 1124 (Bkrtcy., D.Utah 1981). It was intended as "interim protection, designed not as a purgative of all creditor ailments, but as a palliative of the worst: reorganization, dismissal, or liquidation will provide the final relief." *Id.*

The superpriority, because of its equitable underpinnings, is also, in large measure, fact-specific. But unlike adequate protection, it is not a fulcrum for balancing interests; it is an interest to be weighed in the balance. Moreover, it will emerge, most often, not during the interim between petition and plan, but when debtors are in the throes of liquidation and during the final, most uncertain stage of bankruptcy. Thus, whereas adequate protection shields the creditor in the first instance from impairment in the value of his "interest in property," the superpriority was intended to recapture value unexpectedly lost during the course of a case: "It establishes a statutory fail-safe system in recognition of the ultimate reality that protection previously determined the 'indubitable equivalent' ... may later prove inadequate." *In re Marine Optical, Inc.,* 10 B.R. 893, CCH Bankr.L. Rep. ¶ 67,991 at 78,993 (Bkrtcy.App., D.Mass., 1981).

### Guidelines for Allowance of a Superpriority

Guidelines for allowing a superpriority may be distilled from 507(b), its language, history, and relation to adequate protection. The language of 507(b), especially in relation to 503(b), is difficult to plumb. Indeed, 503(b) and 507(b) may be at odds. One is keyed to preserving the estate, the other is designed to protect secured creditors. Coincidentally, they reflect the tension of interests in this case between counsel who re-

---

**21a.** One commentator has opined that the "relative certainty" standard of H.R. 8200 is a retreat from the result in *Yale Express. See* Rosenberg, "Beyond *Yale Express*: Corporate Reorganization and the Secured Creditor's Rights of Reclamation," 123 V.Pa.L.Rev. 509, 535–536 (1975).

quest fees and Rand which demands super-priority. If 507(b) is faithful to one of these purposes, it may be untrue to the other.[22]

The history of the superpriority and its relation to adequate protection share this ambivalence. If the Commission proposal, *Yale Express,* and H.R. 8200 are the antecedents of 507(b), then 503(b) with its criteria of need and usefulness to the estate has relevance. But Congress may have discounted these views, establishing a "statu-tory failsafe" to reimburse creditors where there is a shortfall in adequate protection. *See* 124 Cong.Rec. H11,092 (daily ed., September 28, 1978).[22a] This reimbursement may not be reducible to the ambit of 503(b). Indeed, if only administrative expenses qualify under 507(b), the measure of allowance may be fair rental value, or some other indicia of use. A different yardstick, however, may gauge the miscarriage of adequate protection.[23]

**22.** The failure to mesh the language and purpose of 507(b) may have been caused by last minute, rushed draftsmanship. Other wrinkles in the statute are apparent. It treats, for example, "the interest of a holder of a claim secured by a lien on property of the debtor." Adequate protection, however, which deals with "interests in property" may have a broader compass, *see In re Alyucan Interstate Corp.,* 12 B.R. 803, 7 B.C.D. 1123, 1125 n.5 (D.Utah 1981), and likewise reaches not only property of the debtor but also of the estate. Moreover, the reference to claims "allowable" under 507(a)(1) "is obviously in error. Claims are not 'allowable' under Section 507(a)(1). The reference should be to Section 503(b), a section whose content is coterminous with that of Section 507(a)(1)." 3 Collier on Bankruptcy, *supra* ¶ 507.05 at 507–47 n. 5.

Treatises and a few cases mention 507(b) but do not explain its meaning. *See, e. g.,* 3 Collier on Bankruptcy, *supra* ¶ 507.05; D. Cowans, Cowans Bankruptcy Law and Practice, Section 12.4 at 323 (Int. ed. 1980); P. Murphy, Creditors' Rights in Bankruptcy, Section 5.19 at 5–22 (1980); 1 Nortons Bankruptcy Law and Practice, Section 22.08 at 13 (1980); H. Miller & M. Cook, A Practical Guide to the Bankruptcy Reform Act 227–229 (1980); Aaron, "The Bankruptcy Reform Act of 1978: The Full-Employment-for-Lawyers Bill, Part III, Business Bankruptcy," 1979 Utah L.Rev. 405, 463–464; *In re Marine Optical, Inc.,* 10 B.R. 893, CCH Bankr.L.Rep. ¶ 67,991 (D.Mass.Bankr.App. 1981); *In re Garland Corporation,* 6 B.R. 456, 458–459 (Bkrtcy., D.Mass., Bankr.App.Pan., 1980); *In re Bristol Convalescent Home, Inc.,* 12 B.R. 448, 451 (Bkrtcy., D.Conn.1981); *In re Borne Chemical Company, Inc.,* 9 B.R. 263, 269–270 (Bkrtcy., D.N.J.1981); *In the Matter of Fabric Stylesetters, Inc.,* 8 B.R. 872, 7 B.C.D. 212, 214 n. 5 (Bkrtcy., S.D.N.Y.1981); *In re Tucker,* 5 B.R. 180, 6 B.C.D. 699, 701 (Bkrtcy., S.D.N.Y.1980); *In re Western Farmers Association,* 6 B.R. 432, 437 (Bkrtcy., W.D.Wash. 1980).

The Technical Amendments Bill eliminated some but not all of these wrinkles. The House Report appears to adopt the debtor's view of 507(b): "This amendment makes it clear that even where a secured creditor is given ade-quate protection, if such still is insufficient to protect the creditor's interest during the pendency of the proceeding *and the creditor is additionally entitled to an administrative expense claim,* such claim shall be given priority over every other kind of priority claim specified in this section." H.R.Rep.No. 96–1195, 96th Cong., 2d Sess. 14 (1980). (Emphasis supplied.) The Bankruptcy Amendments Act of 1981, parrots the Technical Amendments Bill alteration of 507(b). The Senate Report, however, does not speak to the relationship of 503(b) and 507(b). Sen.Rep.No. 97–150, 97th Cong., 1st Sess. 13 (1981).

**22a.** Arguably, since adequate protection is "completely compensatory," *In re Alyucan Interstate Corp., supra,* 12 B.R. 803, 7 B.C.D., 1127 n. 15, the backup for adequate protection should be no less.

**23.** One commentator has flagged this ambiguity. After quoting the legislative history which "implies that the entire deficiency sustained by the creditor is entitled to super-priority status," he observes that "the language of the subsection itself seems to say something quite different. Unlike the legislative history, subsection 507(b) does not speak in terms of the 'creditor's claim,' but rather of the 'claim allowable under subsection (a)(1) of this section . . . arising from the . . . stay of action, use, sale, or lease, . . . or granting of a lien' on the property in question. The language of the statute, therefore, seems to limit the superpriority by two factors. First, it would seem to apply only to that portion of the deficiency actually incurred as a cost of administration; i. e., the portion incurred *subsequent* to commencement of the proceeding. This could be measured by the interest accrued during that period, or perhaps by the fair rental value of the use of the property during the period—but clearly would not include the entire deficiency claim. The subsection also seems to limit the super-priority to the amount by which the collateral actually decreased in value during the period of administration. The court could well determine that only a small portion of the total deficiency was caused by post-petition decrease in value. Here again,

The parties seek a ruling that the superpriority must be allowed either as an administrative expense or as a guarantee of adequate protection. But neither approach is satisfactory. The statute is a confederation of principles; it cannot be "construed" to favor one at the expense of another; it should be interpreted to account for the merits of all. Hence, equitable considerations, arising from the facts of each case, should be examined. The rights and importance of other interests must be weighed. The manner in which adequate protection was provided and the role of the superpriority as a "backstop" should be considered.[24]

## PROBLEMS OF ALLOWANCE

### The Uninsured Loss

█ Rand argues that adequate protection in the form of a stipulation to procure insurance was afforded; noncompliance resulted in the uninsured destruction of the tractor; therefore adequate protection failed and 507(b) comes into play.

True, the superpriority is born when adequate protection fails. But whether adequate protection has failed depends upon whether and how it has been provided. In this regard, Rand may misconceive the purpose of adequate protection which shelters

creditors "from any impairment in value attributable to the stay. The stay does not cause, but it may forestall a creditor from preventing or mitigating a decline in value. Some harm to collateral however may be unavoidable with or without the stay. Likewise, creditors may acquiesce in some harm to collateral for business or other reasons notwithstanding the stay. In these situations and others which may arise, any impairment in value may not be attributable to the stay. Hence, not every decline in value must be recompensed, only those which, but for the stay, could be and probably would be prevented or mitigated." *In re Alyucan Interstate Corp., supra* at 1126.

The uninsured loss may not have been attributable to the stay for at least two reasons. First, the risk occasioned by the stay, and for which protection in the form of insurance was afforded, was that the tractor, before repossession, would be damaged. There was, however, another risk at work, *viz.*, the risk of inadvertently failing to obtain insurance. Protection against this risk was not and indeed could not have been afforded.

If this risk were allocated between debtor and Rand outside bankruptcy, naturally, it would be borne by debtor, who, as between

the amount entitled to a subsection 507(b) priority would be only a portion of the entire deficiency." Levit, "Use and Disposition of Property Under Chapter 11 of the Bankruptcy Code: Some Practical Concerns," 53 Am.Bank. L.J. 275, 290 (1979) (emphasis in original).

**24.** The question whether debt incurred by an estate without court approval is entitled to an administrative priority, if not analogous, is suggestive. Two authorities have noted that "[u]nauthorized loans may receive this priority 'in such unusual circumstances as would justify equitable relief.' In applying this test, courts consider whether the loan would have been approved if timely application had been made, whether creditors were not harmed by or were benefited by the loan, the good faith of the trustee and lender with respect to whether they believed the transaction was authorized, whether the proceeds of the loan were used solely for purposes authorized by the court, whether the loan was instrumental in aiding the business to continue, and whether there was sufficient time to apply to the court for authority to borrow. Courts usually do not indicate which factor is most important, but if

the lender does not believe in good faith that the loan was at least impliedly authorized, the court should deny priority. In such circumstances the lender cannot reasonably expect the court to accord him priority and to do so would be to give him a windfall. Also, no priority should be granted if the trustee's lack of authority could be discovered by the exercise of reasonable diligence and the lender failed to investigate. Here the lender could have prevented the problem from arising, and to grant him priority would be to reward his negligence. If the lender acts in good faith and exercises reasonable diligence, the priority contracted for should be granted when the loan does not injure creditors and the proceeds are used in the normal course of court-authorized operations of the business. In this situation the only parties who could object have not been harmed and the funds have not been wasted." Tondel and Scott, "Trustee Certificates in Reorganization Proceedings Under The Bankruptcy Act," 27 Bus.Law. 21, 25–26 (1971).

the two innocent parties, was in a better position to prevent the inadvertence. But the risk must be allocated not only between debtor and Rand, but also between Rand and other administrative claimants. As between these parties, Rand was in a better position to prevent the mistake and therefore arguably it should suffer the loss.[25]

Second, the loss which flowed, not from the accident, but from the oversight, while unprotectible under 361, was preventable by Rand. The security agreements permit Rand, when the debtor does not obtain insurance, to pay the premium and charge the account. Under 11 U.S.C. Section 506(b), when the creditor is oversecured, this supplements the allowed secured claim, increasing the lien entitled to protection. Although the fact of reorganization invites more than ordinary diligence by creditors, Rand did not ascertain whether insurance was bought, nor did it exercise its right to default under the stipulation. Indeed, Rand, from one view, may have "acquiesced" in the harm to its collateral.[26]

Nevertheless, deciding whether loss is attributable to the stay, using the abstraction of "cause," in this case, is speculative. The conflict between debtor, Rand, and administrative claimants may be overdrawn. The debtor is a debtor in possession, the fiduciary representative of the estate. The interest of administrative claimants is his stewardship. Even absent court order, this includes the procurement of insurance. A rule which might relax this duty, where possible, should be avoided. *Cf. Reading Co. v. Brown,* 391 U.S. 471, 483, 88 S.Ct. 1759, 1765, 20 L.Ed.2d 751 (1968).[27] The assertion that the failure to insure was preventable, while compelling under other circumstances, is not convincing on these facts. A degree of reliance upon stipulations is warranted, and Rand, with less than a month to act, did not sleep on its rights. These considerations mandate allowance of the uninsured loss as a superpriority.

*Error in the Stipulation*

■ Stipulations raise another complex of problems. On one hand, they show cooperation between creditors and the estate which should be requited. They reduce costs otherwise incurred in litigation and permit a constructive allocation of resources. They lessen the judicial burden of administering the estate, an important principle of the Reform Act. *Cf. In re Curlew Valley Associates,* 14 B.R. 506 (Bkrtcy., D. Utah, 1981).

On the other hand, most authorities have assumed that a court order under 11 U.S.C. Section 362(d)(1) is essential for relief under 507(b).[28] These authorities may be incorrect since 507(b) speaks in terms of the

---

**25.** Although not argued by the parties, and therefore not considered by the Court, there is a question whether the risk of loss in a situation like this may not be divided in terms of the comparative fault of the parties.

**26.** The stipulation, as amended, provided, in part, that "[t]he payments made hereunder shall not prejudice [Rand's] rights, specifically but not limited to those provided for in Section 507, should such payments be determined not to be adequate protection." This disclaimer, while arguably preventing a waiver of rights under the stipulation, has no bearing on Rand's inaction respecting the insurance. In any event, such a provision may be tautological: Rand asserts it has not waived a claim under 507(b) the allowance of which turns, in part, on whether Rand had "acquiesced" in harm to its collateral.

**27.** Although the record is unclear, *see supra* note 9, at 3, there are indications that debtor's failure to obtain insurance may have involved more than simple negligence. Money paid to his prior carrier may have been applied to pre-petition premiums, resulting in the uninsured theft of one tractor. Debtor testified that he could not afford insurance and in February he sought turnover of the money paid to the former carrier. These facts suggest that circumstances rather than inadvertence may have caused the failure to obtain insurance. Moreover, in April, after the tractor had burned, debtor filed a letter with the court stating that he had obtained liability but not casualty insurance. He was running the trailers at this time. Thus, notwithstanding the accident which had put him on notice of the deficiency in coverage, he may have been deliberately, or at least recklessly, ignoring the stipulation.

**28.** *See, e. g.,* P. Murphy, Creditor's Rights in Bankruptcy, Section 5.19 at 5–22 and Section 7.14 at 7–30 (1980) ("Presumably, the benefits of section 507(b) will be available only to a creditor that has made a timely request for

trustee not the court providing adequate protection, and this is consistent with the legislative history to 361.[29] Whether or not an order is required,[30] the stipulation nevertheless may be a factor in allowing the claim.[31] Equity rewards diligence, and a creditor careless in negotiating a stipulation has no standing in chancery. This is especially true where the rights of other parties may be impaired.

On balance, Rand is not entitled to a superpriority for the loss attributable to the error in the stipulation. Disallowance under these circumstances will not discourage stipulations. Rather, it will further care in their formulation. Rand was less the cooperative creditor than reluctant caretaker of its collateral. Hence, its motive in stipulating is not an equitable consideration in its favor. Given the incalculability of values,

some misapprehension is expected; but this error was not the product of excusable neglect. It was a gross miscalculation which could have been easily detected. Indeed, the disparity between the price and stipulation should have warned Rand that something was amiss, prompting investigation, and discovery of the trailer siding and unpaid repair bills. Rand is experienced with this type of collateral, familiar with values and industry trends.[32] Given its sophistication and leverage under the Code, it enjoys substantial bargaining power with debtor. Thus, its claim that it relied upon the representations of debtor in arriving at the stipulated value is unpersuasive. Under these circumstances, equity will look past the form of the stipulation to the substance of the value. The value of $129,000 was a fiction. The loss of $33,447 was no loss.

adequate protection in situations where the initiative is placed on the creditor... It appears from the wording of section 507(b), which is far from clear, that its benefits will extend only to those who have requested adequate protection and will accrue only from the date of such request"); H. Miller and M. Cook, A Practical Guide to the Bankruptcy Reform Act 229 (1980) ("To get the protection of the Section 507(b) super priority, a secured creditor should obtain a court order that he is supposed to be obtaining 'adequate protection' when the trustee exercises his rights under Section 362, 363, 364. In this way, unnecessary litigation can be avoided on this issue if the secured creditor's protection proves inadequate. Although the Code suggests that the court may often determine the adequacy of protection in the first instance, that may not always happen, particularly when the secured creditor and trustee reach an agreement without litigation"); Levit, "Use and Disposition of Property Under Chapter 11 of the Bankruptcy Code: Some Practical Concerns," 53 Am.Bank.L.J. 275, 289 (1979) ("The effect ... may be to inhibit creditors from entering into any agreement for use of their collateral regardless of the protection which the debtor is willing to volunteer. They may prefer to have that protection imposed upon them over their objection and thus be sure to qualify for priority under subsection 507(b) if things do not work out as planned").

**29.** "This section specifies the means by which adequate protection may be provided. It does not require the court to provide it. To do so would place the court in an administrative role. Instead, the trustee or debtor in possession will provide or propose a protection method. If the party that is affected by the proposed action

objects, the court will determine whether the protection provided is adequate." H.Rep.No. 95–595, 95th Cong., 1st Sess. 338 (1977), U.S. Code Cong. & Admin.News 1978, p. 6295. *But cf. In re Alyucan Interstate Corp., supra* 12 B.R. 803, 7 B.C.D., at 1126 n. 12.

**30.** In this case, although the stipulation was consensual, an order implementing its terms was entered. Thus, the court is not required to decide whether a stipulation, without more, triggers relief under 507(b).

**31.** Just as the absence of an order may not defeat rights under 507(b), so also the presence of an order may not guarantee them. An order, submitted by both sides, may add nothing to a stipulation. Recitations that the creditor is adequately protected may have no meaning: the court, absent stipulation, may have imposed different terms. Indeed, it may be argued that, where the parties have stipulated, the order, as an administrative detail, should not be entered, or that the order, if entered, should not be an exculpatory device to shield creditors from the consequences of their own neglect. This may be appropriate where others, who are not given an opportunity to appear and test the merits of the stipulation and order, must otherwise bear the risk of mistake.

**32.** In this regard, Rand is unlike a creditor receiving adequate protection under 361(2) in the form of a replacement lien on collateral with which it is inexperienced. This might disadvantage a creditor and warrant reliance upon representations made by others concerning condition and value.

This amount should not be credited toward a superpriority.

### Market Forces

■ Both sides acknowledge the interposition of the market: several carriers have folded and are liquidating their equipment; newer models are more attractive to entrepreneurs. This combination of circumstances has lowered prices.

The property at stake and its susceptibility to market forces are factors to be considered in determining adequate protection. *See, e. g., In re Alyucan Interstate Corp., supra* 12 B.R. 803, 7 B.C.D., at 1125 ("[P]rotection may vary if the property is real or personal, tangible or intangible, perdurable or perishable, or if its value is constant, depreciating, or subject to sudden or extreme fluctuations"). Arguably, Rand should have accounted for these forces in negotiating the stipulated interim payments. But the collapse of freighters and the inauguration of products are not readily foreseeable. In this regard, Rand, like debtor, is at the mercy of events beyond its control. Rand did not speculate on the market at the expense of the estate; it was reasonably prompt in obtaining relief from the stay and mitigating damage. The loss resulting from market forces therefore "ought not equitably to be saddled on [Rand] but on [the estate] for whose supposed benefit the restraint was imposed." *In*

*re New York, New Haven & Hartford R. Co.*, 147 F.2d 40, 48 (2d Cir. 1945). *See* discussion *supra* note 21, at 9.

### Depreciation Through Use

■ Since the trailers were used and useful to the estate, debtor, in principle, should not object to loss through depreciation as a superpriority. The question is how much loss. The stipulation provided for interim payments, which if paid, from February to May, would have totalled $4,928. Actual depreciation equalled $6,346. *See supra* note 17, at 4. Should Rand receive the amount it bargained for in the stipulation or the amount of real loss? Equity recommends the former. Rand was not bereft in bankruptcy. It had the background and tools to insure that payments were commensurate with depreciation. Indeed, if it had calculated depreciation based upon the security agreements, *see supra* note 15, at 4, the amount would have been $9,300. This figure, unlike the stipulated payments, approximates the real loss. The court is reluctant to penalize the estate for an error which could have been remedied by Rand.[33] The depreciation allocable to superpriority is therefore $4,928, minus payments received in the amount of $2,464,[34] or $2,464.[35]

### Calculating the Superpriority

■ In principle, calculation of the superpriority is straightforward; the error in

---

**33.** Indeed, it has been suggested that, in arranging for interim payments, the parties should "err on the high side," since this not only protects the creditor but also increases equity in the collateral for the estate. Murphy, "Use of Collateral in Business Rehabilitations: A Suggested Redrafting of Section 7–203 of the Bankruptcy Reform Act," *supra* at 1506.

**34.** There is a discrepancy in the record over this amount. John Dean testified that payments in the amount of $2,460 were received. Counsel for debtor represented that the amount was $2,400. Rand, in its proof of claim and memorandum, says $2,464.

**35.** Rand stipulated that $1,232 per month was the "fair and reasonable depreciation" for the equipment. It demanded, however, that an additional amount, alternately termed "interest" and "opportunity cost," be paid. This question was argued to the court but, given the stipulated value of $129,000, the "cushion" which this

represented, and the court's reasoning on adequate protection in *In re Alyucan Interstate Corp., supra*, an answer to this question was deferred. In hindsight, this "cushion" did not exist. Indeed, the error in the stipulation means that the allowed secured claim at the relief from stay hearing was $95,553, or in other words, $10,695 less than the debt owing. Under these circumstances, the appropriateness of "opportunity cost" as an element of adequate protection should have been ruled upon. Arguably, it should be considered in assessing the degree of error in the amount of interim payments. In either event it would be a factor in determining the amount of superpriority. The court believes, however, that but for the error in the stipulation, these problems would have been resolved and would not now be left for conjecture. Rand's mistake in the first instance thus prejudices whatever rights it may have had in this regard under 507(b).

the stipulation, however, complicates the figures in this case. Ordinarily, the loss eligible for superpriority status [35a] should be deducted from the value of the collateral at the adequate protection hearing. The extent to which this erodes the allowed secured claim on that date constitutes the allowed superpriority. Here, eligible loss equalled $19,411 for the burned tractor, $7,993 for market decline, and $2,464 for depreciation, for a total of $29,868. The value of the collateral and the allowed secured claim on January 23, making adjustments for the error in the stipulation, was $95,553; the value of the collateral and the allowed secured claim on June 5 was $61,803, for a reduction of $33,750. The allowed secured claim is diminished by more than the eligible loss. The difference of $3,882 is the ineligible loss attributable to depreciation through use. Hence, the eligible loss is the allowed superpriority.

If adjustments were not made for the error in the stipulation, the result would be different. The loss of $29,868 would be subtracted from $129,000, i. e. it would be charged against the "equity cushion" which existed on that date. The brunt of the loss would be borne by the estate, and would erode the allowed secured claim ($106,248)

by only $7,116. This would be the allowed superpriority.

Since the stipulated value was not credited for purposes of determining loss, however, it should not be a factor in calculating the superpriority. The adjusted figures are therefore used, yielding a superpriority of $29,868.[36]

## PROBLEMS OF RANK

Rand argues that the superpriority has precedence over claims allowed under 503(b). Attorneys fees may be allowed under 503(b)(2). Thus no fees may be paid until the superpriority is satisfied.[37] This argument is flawed, however, for several reasons.

Fees are allowed under 11 U.S.C. Section 330 and classified as administrative expenses under 503(b)(2). But while other administrative expenses must wait until confirmation, 11 U.S.C. Section 1129(a)(9), or liquidation, 11 U.S.C. Section 726, for reimbursement,[38] fees are payable on an interim and therefore a preeminent basis under 331. Not only the statutory scheme but also reasons of policy support this preeminence of fees under 331.[38a]

Lenders like Rand may be involuntarily harnessed to the ordeal of reorganization, but fee claimants voluntarily contribute to

---

**35a.** The term "loss" is used for convenience of expression and does not imply that lost value is, in every case, the measure of the superpriority.

**36.** Rand submitted a proof of claim which calculated the superpriority by subtracting the June value (minus costs of repair) from the January value of the collateral. Rand recognized in subsequent memoranda that, at most, it is entitled to the difference between the allowed secured claim in January and June. These memoranda pad the allowed secured claim by adding interest until June 17 (up to $120,234). Interest, however, only accrues when the creditor is oversecured. Given the mistake in the stipulated value of $129,000, Rand was never oversecured, and hence, no interest accrued. Even absent the mistake, Rand would have been oversecured only from January 23 until approximately three weeks later when the tractor was destroyed. Using the per diem in the record, this would have meant interest in the amount of $1,079.

**37.** This conflict between interim fees and the superpriority was anticipated but not addressed in *In the Matter of Fabric Stylesetters, Inc.*, 8 B.R. 872, 875 n. 3 (Bkrtcy., S.D.N.Y. 1981). *Cf. In re National Buy-Rite, Inc.*, 10 B.R. 380 (Bkrtcy., N.D.Ga.1981); *In re Western Farmers Association*, 12 B.R. 803, 7 B.C.D. 1214 (W.D.Wash.1981). Conflicts between other sections of the Code and the superpriority are also apparent but not easily resolved. *See* 11 U.S.C. Sections 546(c)(2) and 726(b), and authorities cited *supra*, note 18, at 5.

**38.** With the exception of 331, the Code is silent as to when administrative claims are payable. As a practical matter, and under the auspices of prior case law, the court may permit the payment of operating expenses as they are incurred in a reorganization. *Cf. In re Standard Furniture Company*, 3 B.R. 527, 6 B.C.D. 270, 273 (Bkrtcy., S.D.Cal.1980).

**38a.** Section 507(b) gives the superpriority precedence over claims allowed under 507(a), or in other words, over claims allowed under 503(b).

the ideal of rehabilitation. Section 331 encourages this volunteerism and, as an inducement to work for the estate, is a vital provision of the Reform Act which places the burden of administration upon trustees, creditor committees, and their professional representatives. *Cf. In re Curlew Valley Associates, supra.*[39] Absent this incentive, it would be difficult to assure continued efficient management. *See, e. g.,* 2 Collier on Bankruptcy, *supra* ¶ 331.02 at 331–5. Requests for adequate protection in Chapter 11 are ubiquitous; each raises the spectre of a superpriority. If the superpriority, in turn, might preempt interim fees, it would jeopardize the further provision of services. The result would not be attractive. The administrators might mutiny: but the case, whether in Chapter 11 or in a superseding Chapter 7, would not care for itself. They might cut corners: but this would cause delay, which is anathema to creditors, especially those holding a superpriority who are waiting for confirmation or liquidation. They might demand exorbitant retainers at the beginning of each case: but for most debtors this either would be impossible or would decrease their chances for rehabilitation.[40]

 These dangers do not dictate that in every instance fees must be paid ahead of the superpriority. Section 331 says that fees "may" be paid on an interim basis. There is a presumption, for the reasons outlined above, that they will be paid notwithstanding the existence of a superpriority. This presumption may be strengthened, for example, where a trustee or his representative who is requesting fees was installed at the behest of a creditor entitled to a superpriority. *Cf. In re Hotel Associates, Inc.,* 6 B.R. 108, 114 (Bkrtcy., E.D.Pa. 1980).[41] But it is rebuttable under appropriate equitable circumstances. *Cf.* 2 Collier on Bankruptcy, *supra* ¶ 331.01 at 331–3 ("The genesis of interim compensation is rooted in the equity powers of the bankruptcy court"). These circumstances, however, are not present in this case.

IT IS THEREFORE ORDERED:

1. Rand is allowed a superpriority in the amount of $29,868.

2. Fees of counsel for debtor and the unsecured creditors committee which have been previously allowed shall be paid forthwith.

---

*See supra* note 22, at 12. Fees, however, may be allowed under 330 and 331. When allowed under these provisions, instead of 503(b)(2), they are not subject to the regimen of 507. Moreover, as indicated in the text, fees are not only allowed but also payable under 331. Section 507(b), in contrast, is silent respecting payment. This gives a *de facto* preeminence to fees.

**39.** Fee claimants and creditors play important roles in the reorganization drama. In balancing those roles, however, Congress may have believed that creditors enjoy an overload of protection. Unlike fee claimants, who rely upon promises that debt will be restructured and that post-petition expenses will receive priority in payment, creditors can insist on security for their loans; they can charge interest at rates which compensate for the risk of bankruptcy; they can police practices which jeopardize their interests. *Cf.* Comment, "Use of Secured Creditors' Collateral in Chapter X Reorganizations: A Proposed Modification of the Commission's and Judges' Bills," 1976 J. Corp. Law. 555, 577. Moreover, creditors receive an arsenal of remedies in bankruptcy. *Cf. In re Alyucan Interstate Corp., supra,* 12 B.R. 803, 7 B.C.D., at 1124. Section 331, therefore, may have been designed to restore an equilibrium of rights in reorganization.

**40.** It is likewise unfair, if not unrealistic, to expect counsel to underwrite the reorganization. This would drive experienced and expert counsel to more reliably lucrative fields of practice. *Cf.* 2 Collier on Bankruptcy, *supra* ¶ 331.01 at 331–2–331–3; *In re International Horizons, Inc.,* 10 B.R. 895, 897 (N.D.Ga.1981); *In re Quick Release, Inc.,* 6 B.R. 713, 715 (Bkrtcy., D.S.C.1980); *In re Western Farmers Ass'n.,* 8 B.R. 539, 542 (Bkrtcy., W.D.Wash. 1981).

**41.** The parties have not raised the question whether any portion of the fees may be classified under 11 U.S.C. § 506(c), and if so, what relation they would bear to the superpriority. *Cf. In re Multiponics, Inc.,* 551 F.2d 1049 (5th Cir. 1977).