**In re McFARLIN'S, INC., Debtor.**

**Bankruptcy No. 82–20306.**

United States Bankruptcy Court, W.D. New York.

Oct. 25, 1983.

Woods, Oviatt, Gilman, Sturman & Clarke by Paul S. Groschadl, Rochester, N.Y., for Marine Midland Bank.

Goldstein, Goldman, Kessler & Underberg by John Ninfo, Rochester, N.Y., for McFarlin's, Inc.

Siegel, Sommers & Schwartz by Lawrence C. Gottlieb, New York City, for Creditors Committee.

## MEMORANDUM AND DECISION

EDWARD D. HAYES, Bankruptcy Judge.

An application has been made by Marine Midland Bank, N.A., hereinafter referred to as "Marine", to have their claim in the amount of $206,680.73 treated as a superpriority lien under 11 U.S.C. § 507(b). A hearing was held and briefs have been submitted by Marine, the debtor, and the creditors committee for the debtor.

McFarlin's was an old line retail men's clothing store selling the top lines. They filed a petition under Chapter 11 of the Bankruptcy Code on March 16, 1982. Marine was the secured creditor who had liens upon the accounts receivable, inventory, equipment and leasehold improvements of the debtor. At the time of filing, McFarlin's owed approximately $675,000 to Marine and the collateral securing the debt was valued at $728,252.04 in the debtor's schedules. Nine days after the filing, McFarlin's and Marine entered into a stipulation for the use of cash collateral and for adequate protection. The stipulation required periodic payments and maintenance of existing collateral.

Under the Chapter 11, McFarlin's continued to operate at a loss. It made some of the adequate protection payments, $87,571.31, to Marine. It did not maintain collateral levels. Marine claims that by November 30, 1982, the collateral had declined to $434,000 or a deterioration of $294,252.04 in the collateral position of Marine.

On or about December 1, 1982, McFarlin's started a court approved liquidation sale at its only remaining location. The landlord attempted to stop the sale alleging lease violation. Marine and the creditors committee joined in the opposition to the landlord and the sale was permitted. The remaining collateral, valued by Marine at $434,000, was liquidated and Marine received net proceeds of $131,100.29. Marine then amended its claim as an unsecured claim to $454,738.01. It claims a superpriority of $206,680.73 which is the claimed decline in its collateral value between March 16, 1982 and November 30, 1982 of $294,252.04, less the adequate protection payments made during that period of $87,571.31. Their application seeks payment of the priority portion of the claim to the extent of the remaining assets in the case.

At the present time, the debtor is no longer operating and there is a fund of some $165,000 which has been generated and segregated to fund what in all probability is a liquidation plan which was filed on May 6, 1983 by the creditors committee. The source of the $165,000 is some $15,000 cash collateral existing since the filing, some $55,000 generated by the sale of merchandise consigned to the debtor for the purpose of promoting the liquidation sale and some $80,000 which is the proceed of the settlement of a cause of action between McFarlin's and its landlord.

The debtor and the creditors committee strenuously oppose the motion to classify a portion of Marine's claim as an 11 U.S.C. § 507(b) superpriority lien. They oppose on two premises. The first argument against the granting of superpriority lien arises out of the contention that the property which existed at the time McFarlin's filed its petition in bankruptcy was not of the value set forth in the schedules of the debtor and the stipulation to use cash collateral entered into between the debtor and Marine, the secured creditor, and which stipulation was approved by this Court as a basis for adequate protection. The second argument offered by the debtor and the creditors committee is that Marine, the secured creditor, has waived its right to a superpriority claim by waiting 16 months to assert such a claim, by acquiescing in the continued use by the debtor of the cash collateral even when adequate protection payments were not being made and collateral levels were not being maintained. The creditors committee also claim that by Marine not asserting their superpriority claim at an earlier time, they mislead the creditors committee to

such an extent that members of that committee and the attorney for the committee exerted time and effort to generate funds which they would not have done had they known Marine was going to claim a superpriority in them.

Marine chose to rest upon proof of the valuations which have been made at the beginning of the case and they felt that by doing so they had adequately proved their right to their superpriority lien. This Court did schedule hearings on the valuation problem and at that hearing, the only witnesses were the president of the debtor and the head of the creditors committee who has had a long period of experience in dealing with men's clothing stores. It appears that when the debtor valued his inventory for instance he valued it at cost. However, from the testimony, it appears that the inventory was out-dated, had size gaps and there was a complete lack of men's furnishings. It was the testimony of both witnesses that under those circumstances if the property had been turned over to the bank at that time that the cash collateral agreement was entered into the bank would have only received between 5–20% of the cost value of that inventory. The accounts receivable which were part of the security again had been taken at face value. However, on examination it appears that very little of the accounts receivable that existed at the time of the filing were current accounts receivable, or were accounts receivable to be paid by Visa, Mastercard or the like. McFarlin's extended credit to the public and the accounts receivable were old and paid over a period of time. The debtor's president said that they would be lucky to receive 70 cents on the dollar on the accounts receivable. The gentleman who was head of the creditors committee said that those types of accounts receivable were worth 33% of the value. The leasehold improvements which the debtor owned and upon which Marine had a lien had been valued at cost less depreciation. In liquidating them, little or no actual cash was generated. They were over valued in the schedules and stipulation. In fact, the attorney for the debtor argued that even if the most optimistic, realistic values were used the creditor would only be entitled to between $4,000–5,000 as a superpriority.

3 Colliers on Bankruptcy ¶ 506.04 at page 506–17 et seq. states:

> The extent to which an allowed claim constitutes a secured claim may vary during the course of a bankruptcy case. The principal causes of such potential variance are (a) payments during the course of the bankruptcy case in reduction of a secured claim and (b) fluctuations in the value, and the applicable method of valuation pursuant to the second sentence of section 506(a), of the subject collateral. In many instances, such variances are of merely academic interest. For example, the amount of a secured claim might be determined in connection with distributions by a chapter 7 trustee or under a plan, but at no other time during the course of a bankruptcy case. On the other hand, particularly in chapter 11 or 13 cases, the amount of a single secured claim might be fixed, for example, at one amount at the outset of a case in connection with a request by its holder under section 362(d) for relief from the automatic stay or, in the alternative, provision of adequate protection, at another amount later in the case in connection with a determination of whether such holder is adequately protected if a senior or equal lien is granted to a postpetition lender under section 364(d), at another amount in connection with a proposed disposition of the collateral, at another amount in connection with a proposed redemption of the collateral under section 722, and at still another amount late in the case for purposes of a plan. Thus, the amount of any claim secured by collateral of changeable value must be regarded as a "moving target" and, in view of the potential significance of such amount at different stages of a bankruptcy case, may be an important and recurring issue in the case...

One of the cases discussing the superpriority is In re Callister, 15 B.R. 521 (Bkrtcy. 1981), Judge Mabey at page 532, says:

On balance, Rand is not entitled to a superpriority for the loss attributable to the error in the stipulation. Disallowance under these circumstances will not discourage stipulations. Rather, it will further care in their formulation. Rand was less the cooperative creditor than reluctant caretaker of its collateral. Hence, its motive in stipulating is not an equitable consideration in its favor. Given the incalculability of values, some misapprehension is expected; but this error was not the product of excusable neglect. It was a gross miscalculation which could have been easily detected. Indeed, the disparity between the price and stipulation should have warned Rand that something was amiss, prompting investigation, and discovery of the trailer siding and unpaid repair bills. Rand is experienced with this type of collateral, familiar with values and industry trends. Given its sophistication and leverage under the Code, it enjoys substantial bargaining power with debtor. Thus, its claim that it relied upon the representations of debtor in arriving at the stipulated value is unpersuasive. Under these circumstances, equity will look past the form of the stipulation to the substance of the value. . . .

After the hearing held, this Court has a sincere doubt about the values upon which Marine seeks its superpriority and certainly as to this point Marine should bear the burden of proof. But even if Marine had clearly established its loss, its failure to act during the period in which the debtor operated the business under Chapter 11, its participation with the unsecured creditor in encouraging their activities raise equitable considerations that negate their right to superpriority status. As Judge Mabey said in *Callister,* (supra) at page 530 and see his footnote 24 on that same page both of which are set forth below:

... The statute is a confederation of principles; it cannot be "construed" to favor one at the expense of another; it should be interpreted to account for the merits of all. Hence, equitable considerations, arising from the facts of each case,

should be examined. The rights and importance of other interests must be weighed. The manner in which adequate protection was provided and the role of the superpriority as a "backstop" should be considered.

Footnote 24

The question whether debt incurred by an estate without court approval is entitled to an administrative priority, if not analogous, is suggestive. Two authorities have noted that "[u]nauthorized loans may receive this priority 'in such unusual circumstnaces as would justify equitable relief.' In applying this test, courts consider whether the loan would have been approved if timely application had been made, whether creditors were not harmed by or were benefited by the loan, the good faith of the trustee and lender with respect to whether they believed the transaction was authorized, whether the proceeds of the loan were used solely for purposes authorized by the court, whether the loan was instrumental in aiding the business to continue, and whether there was sufficient time to apply to the court for authority to borrow. Courts usually do not indicate which factor is most important, but if the lender does not believe in good faith that the loan was at least impliedly authorized, the court should deny priority. In such circumstances the lender cannot reasonably expect the court to accord him priority and to do so would be to give him a windfall. Also, no priority should be granted if the trustee's lack of authority could be discovered by the exercise of reasonable diligence and the lender failed to investigate. Here the lender could have prevented the problem from arising, and to grant him priority would be to reward his negligence. If the lender acts in good faith and exercises reasonable diligence, the priority contracted for should be granted when the loan does not injure creditors and the proceeds are used in the normal course of court-authorized operations of the business. In this situation the only parties who could object have not been

harmed and the funds have not been wasted." Tondel and Scott, "Trustee Certificates in Reorganization Proceedings Under the Bankruptcy Act," 27 Bus. Law. 21, 25–26 (1971).

Therefore, for the reasons set forth above, the superpriority claim of Marine in this proceeding is denied and it is so ordered.