**In re Donald and Zoe Ann BRAMHAM, Debtors.**

**Donald and Zoe Ann BRAMHAM, Plaintiffs,**

**v.**

**NEVADA FIRST THRIFT, Defendant.**

Bankruptcy No. BK–R–82–424.
Adv. No. 83–245.

United States Bankruptcy Court,
D. Nevada.

March 15, 1984.

Vernon E. Leverty and Victor Perri, Miller & Daar, Reno, Nev., for plaintiffs.

C.N. Pereos, Reno, Nev., for defendant.

## MEMORANDUM DECISION

ROBERT C. JONES, Bankruptcy Judge.

*Background* *

In April of 1980, plaintiffs Don and Zoe Bramham (debtors) were the owners of a residence and an adjacent undeveloped lot located at Lake Tahoe, Nevada. At that time, the debtors obtained a loan with a principal amount of some $47,000 from defendant Nevada First Thrift (NFT),[1] which was secured by a deed of trust on the residence junior to one held by First Interstate Bank of Nevada (FIB).[2] The monthly payments on the NFT note were made until October 1981, when the debtors ceased making payments. Following this default, NFT filed on 22 December 1981 a notice of default and election to sell the residence pursuant to NEV.REV.STAT. § 107.080 (1979). Shortly before NFT's scheduled non-judicial foreclosure sale, the debtors filed their joint Chapter 11 petition and obtained the protection of 11 U.S.C. § 362(a)'s automatic stay, thereby preventing the foreclosure and becoming debtors in possession. Since filing their petition, the debtors have made no payments to FIB or NFT.

While the debtors and NFT disagree on the value of the residence as of the 1 July 1982 petition date, the Court establishes that value at $160,000.[3] The parties do

---

* Except for any factual dispute expressly noted below, the facts recited are either a matter of official court record or are uncontested by the parties.

1. The loan, dated 25 April 1980, bears a variable interest rate of not less than 24.41 percent.

2. While the parties themselves appear to be unsure whether FIB holds one or two trust deeds on the residence (bankruptcy schedule A–2 lists NFT as holding a "second" trust deed), FIB's primary position is unquestioned. For purposes of this decision, the Court will characterize FIB's trust deed as the "first" and NFT's trust deed as the "second."

3. The debtors submitted appraisals dated 8 December 1982 placing the residence's value at $160,000 and the lot's value at $65,000. NFT's appraisal of the residence alone, dated 29 April 1983, estimated the value as being $190,000. Considering the relative thoroughness of the appraisals, the qualifications of the appraisers, and the amount actually bide by NFT at its

agree that the amount of ·FIB's allowed secured claim on the petition date was $108,885.34.[4] It being an oversecured creditor, that figure represents the full amount of FIB's claim on that date. *See* 11 U.S.C. § 506(a).[5] NFT's claim as of the petition date was listed on the debtors' Schedule A–2 (Creditors Holding Security) in the amount of $68,853.89. However, the debtors have not contested but have adopted NFT's subsequent representation that the petition date claim amount was $79,208.67, even though NFT has not filed a proof of claim for this higher, unscheduled amount. For the purpose of this matter the Court accepts the higher figure, and shall deem the schedule as amended to reflect the higher amount, pursuant to Bankruptcy Rule 1009 (debtor may amend a schedule as a matter of course "at any time before the case is closed"). Given the $160,000 petition-date value and FIB's allowed secured claim of $108,885.34, the amount of NFT's allowed secured claim on that date was $51,114.66, and its allowed unsecured claim was $28,094.01.[6]

On 15 November 1982, NFT filed a "Motion for Order to Provide Adequate Protection," pursuant to 11 U.S.C. § 363(e).[7] With this motion NFT sought to have the Court "enter an order prohibiting or other-wise conditioning the use" of the residence "as is necessary to provide adequate protection" of NFT's interest. On 16 November 1982, notice of a 16 December 1982 hearing on NFT's motion (and notice of an earlier motion to convert the case to Chapter 7) was sent to all creditors listed on the debtors' mailing matrix. At the time set for hearing, NFT informed the Court that it was withdrawing its motion to convert and that it had reached a stipulation with the debtors regarding its ·adequate protection request. Counsel for the debtors then put the essence of the stipulation, which gave NFT an interest in the unimproved lot and allowed the debtors four months to sell their real property, on the record.[8] No creditors other than NFT were heard at the hearing, and apparently none attended. The oral stipulation was then reduced to writing, signed by visiting Judge Samuel J. Steiner, and filed with the Clerk of the Court the following day.

In consideration of NFT's waiver of payments on its note until 15 April 1983, the debtors agreed to provide NFT a first deed of trust on the lot (amount or value of this security interest in the lot was not specified). The stipulation also allowed the debtors until 15 April 1983 to liquidate the residence and the lot,[9] "for a sum sufficient

---

foreclosure sale ($162,705) the higher figure is rejected.

**4.** The $108,885.34 figure is identical to that listed by the debtors on their schedules, and was not listed as disputed, contingent, or unliquidated. *See* 11 U.S.C. § 1111(a).

**5.** In part, § 506(a) reads:

"An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim."

**6.** *Id.*

**7.** 11 U.S.C. § 363(e) reads:

"[A]t any time, on request of an entity that has an interest in property used ... by the trustee [or debtor in possession pursuant to § 1107(a) ], the court shall prohibit or condition such use ... as is necessary to provide adequate protection of such interest."

**8.** "[Counsel for the debtors]: Your Honor, I am going to amend our plan [liquidation plan filed on 6 December 1982] ... to encompass this stipulation in the disclosure statement and the plan, since it affects it. And what the parties have stipulated to is that Nevada First Thrift be allowed a lien on the adjacent property to the residence, which is unencumbered; that will protect their [sic] position as holders [sic] of the second. And also that within the plan, ... the Bramhams will have until April 15th by which to sell the property. And then at that time the stay would be lifted on the property; and the holders of the first or second could foreclose." Transcript of the 16 December 1982 hearing, pp. 2–3.

**9.** This is consistent with the debtor's amended disclosure statement, filed 17 December 1982, which proposed a combined sale of the residence and the adjoining lot.

to pay all principal and accrued interest, together with any and all advances, due and owing" NFT. And if the payment of "[a]ll sums due and owing pursuant to the terms of [NFT's note]" were not paid on or before 15 April 1983, the stipulation provided for the automatic modification of the § 362(a) stay to permit NFT "to immediately file notice of intent to sell and to proceed to foreclose its security interest."[10] This stipulation made no mention of the residence's value. Pursuant to the stipulation the debtors encumbered the lot with a trust deed naming NFT as the beneficiary.

Between December 1982 and April 1983 the debtors were unable to sell the house and lot. Faced with the prospect of foreclosure, they sought on 15 April 1983 a preliminary injunction restraining NFT's foreclosure until the Court could determine the exact amount of NFT's allowed secured claim. (The debtors had filed an objection to NFT's claim on 30 March 1983.) On 15 April 1983, pending a decision on NFT's right to the additional security and the true amount of its allowed secured claim, this Court enjoined NFT from taking any action to enforce its trust deed on the lot, but allowed the trustee's sale on the residence to proceed. On or about 25 May 1983, NFT purchased the residence at the trustee's sale for $162,705.00.

During the pendency of the injunction against NFT's sale of the lot, the debtors filed a "complaint to set aside lien" against NFT on 26 May 1983. This complaint, which is the subject of the present adversary proceeding, pleads two causes of action: first, that NFT's trust deed on the lot be set aside as invalid because the underlying stipulation and notice to creditors was defective; and second, that the amount of NFT's allowed secured claim be reduced because of its undersecured status at the time the Chapter 11 petition was filed. The second cause of action effectively supplants the debtors' earlier "objection to claim" pleading. With this complaint on file, the Court's preliminary injunction was extended until trial.

At the 8 July 1983 trial of the complaint, the parties were instructed by the Court to list both the house and lot for sale, with the final disposition of the proceeds to await the resolution of the complaint. After the parties completed a post-trial briefing schedule, the matter was submitted for the Court's decision.

*Discussion*

Under their first cause of action, the debtors seek to invalidate NFT's trust deed on the undeveloped lot because: 1) the underlying written stipulation contained a serious error regarding the value of the residence, without which the stipulation providing adequate protection would not have been executed, i.e., NFT was actually undersecured; and 2) the stipulation was, in effect, a "settlement of a controversy," whose hearing was not noticed as required by Interim Bankruptcy Rule 2002(b).[11]

---

**10.** Because NFT had not yet obtained its trust deed on the lot and had only filed its notice of breach on the second trust deed, this Court would be inclined to rule that this threatened automatic foreclosure (made possible by what is popularly termed a "drop dead" stipulation) only applied to the residence property. Under Nevada law, filing a notice of breach and election to sell is just the first step of notice required before a trustee exercises his power of sale. After three months have passed following this initial notice, the trustee must give notice of the time and place of sale. NEV.REV.STAT. § 107.080 (1979). The language in the stipulation appears to have presumed the occurrence of the first step, but not the second. Also, the stipulation refers to NFT's "security interest" (singular). However, it appears that the debtors may have admitted that the "drop dead" stipula-

tion was intended to apply to both the residence and the lot. In debtors' complaint initiating this present adversary proceeding the stipulation is interpreted as allowing "the stay to be lifted after April 15, 1983 as to defendant [NFT] to notice of breach [sic] and to sell Plaintiff-debtors' real property at a trustee's sale under the terms of said *trust deeds* " if the debtors failed to sell. (Emphasis added.)

**11.** Interim Bankruptcy Rule 2002(b) (adopted as a Local Rule in this District), like present Bankruptcy Rule 2002(a) that superceded it on 1 August 1983, required a 20-day notice to parties in interest of a "hearing on approval of a compromise or settlement of a controversy, unless the court for cause shown directs that notice not be sent."

## I.

■ The debtors cite the case of *In re Callister*, 15 B.R. 521 (Bkrtcy.D.Utah 1981), in support of their argument that the stipulation here must be set aside because of an error as to the value of the residence. In *Callister*, the court denied a creditor's request for a superpriority administrative claim, 11 U.S.C. § 507(b), which was based upon a purported "loss" caused by a decrease in the collateral's value. The court found there was no actual loss, but that the claimed loss was the product of a "gross miscalculation [of value in the stipulation] which could have been easily detected," *id.* at 532. The *Callister* court did not reject the stipulation *in toto*, but merely denied one purported measure of loss because of a gross and obvious error. In the present proceeding, unlike *Callister*, the value of the residence [collateral] was not even mentioned in the stipulation. The fact that NFT may have been undersecured should not deprive it of a right to the adequate protection provided in the stipulation. As will be discussed below, given that the debtors were making no payments on the oversecured senior lienor's [FIB] debt, and given NFT's undersecured position, NFT had ample cause for its § 363(e) request regardless of any mistaken belief as to the collateral's value.[12] The Court will first analyze NFT's right to adequate protection.

## II.

■ Section 361 reads, in part: "When adequate protection is required under section 362, 363, or 364 ... of an interest of an entity in property, such adequate protection may be provided by— ... (2) providing to such entity an additional ... lien to the extent that such stay [under § 362], [or] use [under § 363] ... results in a decrease in the value of such entity's interest in such property ..." An allowed secured claim[13] is an interest in property entitled to § 361's protection[14] against any decrease in value attributable to use or the stay.[15] The automatic stay may be said to "forestall a creditor from preventing or mitigating a decline in value"[16] of the allowed secured claim, and to this extent the holder of an evaporating allowed secured claim is entitled to adequate protection if, but for the stay or use, or both, the evaporation could be prevented or mitigated.

Generally, the amount of an allowed secured claim decreases either because the value of the collateral is depreciating,[17] or the allowed secured claim of a senior creditor is increasing faster than the allowed

---

**12.** Apparently because NFT did not believe the Court would grant a lift stay request, NFT simply moved for adequate protection instead of seeking a lifting or modification of the automatic stay. The basis for this belief is unclear. Perhaps it knew the debtors would shortly file their liquidation plan, *see* 11 U.S.C. § 1123(b)(4); perhaps it believed there was a small equity in the residence; or perhaps it merely wanted protection against the accruing interest on FIB's superior claim. This latter reason seems probable in light of debtors' counsel's statement at the adequate protection hearing that the purpose of the stipulation was to protect NFT's "position as holders [sic] of the second." The fact that a § 363(e) request was filed instead of a complaint (now motion) to lift stay is insignificant. In either case the debtors would have been confronted with the problem of adequate protection—whether it was lacking and, if so, how it would be supplied. As it happened, the parties agreed NFT was entitled to adequate protection of its allowed secured claim and also agreed how it was to be provided.

**13.** *See supra* note 6. *See also In re South Village, Inc.*, 25 B.R. 987, 989 n. 2 (Bkrtcy.D.Utah 1982) (legislative history of § 506(a) discussed).

**14.** "Adequate protection of an interest of an entity in property is intended to protect a creditor's allowed secured claim." 124 Cong.Rec. 32,395 (1978) (Statement of Rep. Edwards). However, "the unsecured part of a claim [is] not ... entitled to protection." *In re BBT*, 11 B.R. 224, 229 (Bkrtcy.D.Nev.1981).

**15.** *In re Alyucan Interstate Corp.*, 12 B.R. 803, 806–08 (Bkrtcy.D.Utah 1981).

**16.** *Id.* at 808.

**17.** According to § 506(a), the allowed secured claim only includes "the value of such creditor's interest in the estate's interest in such property." Naturally, if the value of the property decreases, then there is a corresponding decrease in the estate's interest and in the amount of the allowed secured claim.

secured claim of a junior creditor. The facts of this case present an example of the second cause. Given the Court's adoption of the 8 December 1982 appraisal, the bid price at the May 1983 foreclosure sale, and the overall sluggishness of the Lake Tahoe real estate market,[18] the Court will assume the residence's value remained relatively static (at $160,000) during the year between the petition date (1 June 1982) and the foreclosure (25 May 1983). What jeopardized and dissipated the amount of NFT's allowed secured claim ($51,114.66 on 1 June 1982) was the ever-increasing amount of FIB's allowed secured claim and the collateral's static value.

■ The pre-Code [19] general rule regarding the accrual of post-petition interest on claims was disallowance. But then, as now, there were exceptions:

As to interest on claims, the general rule is that it is to be computed only to date of filing of the bankruptcy petition, though exceptions have been recognized where the estate turns out to be solvent and more than sufficient to pay everything in full, and *with respect to secured debts to the extent that the security is adequate to pay additional interest.*

2 H. Remington, *A Treatise on the Bankruptcy Law of the United States* §§ 726–27 (1956) (footnotes omitted, emphasis supplied). The corresponding current law has been codified as Bankruptcy Code §§ 502(b)(2) and 506(b).[20] Section 502(b)(2) is a contemporary restatement of the general rule stopping interest accrual on the petition date,[21] while § 506(b) grants oversecured creditors post-petition interest, charges, costs, or fees. Undersecured creditors do not enjoy this right, but are subject to § 502(b)(2)'s limitation.[22] The oversecured creditor (FIB) is also entitled to its postpetition interest at the contract rate, notwithstanding the apparent ambiguity in § 506(b)'s language. *In re Loveridge*, 36 B.R. 159, 11 B.C.D. 485 (Bkrtcy.D. Utah 1983); 3 *Collier on Bankruptcy* ¶ 506.05 at 506–36 (15th ed. 1983). Whenever an oversecured creditor's claim has been increased by operation of § 506(b) the total amount of the claim, including the increase, is entitled to adequate protection.[23] This is because the allowed claim has increased in amount.[24]

While the less favorable position of holders of unsecured claims is obvious,[25] this

---

**18.** 8 December 1982 appraisal of residence by Susan F. Glasson, R.M.

**19.** "Pre-Code" refers to the bankruptcy law extant before the 6 November 1978 and 1 October 1979 effective dates of most of the substantive provisions of the Bankruptcy Reform Act of 1978, Pub.L. No. 95–598, 92 Stat. 2549, commonly referred to as the "Bankruptcy Code."

**20.** "Although the old Bankruptcy Act was silent on the issue of the accrual of interest, it seems to have been generally accepted that a secured creditor is entitled to claim postpetition interest in addition to principal only up to a maximum fixed by the value of his collateral. *See In re Penn Cent. Transp. Co.*, 454 F.2d 9, 16 (3d Cir. 1972); 6 *Collier on Bankruptcy* § 9.08 (J. Moore 14th ed. 1978). These principles have been codified in § 506(b) of the new Bankruptcy Code, 11 U.S.C. § 506(b) (Supp. V 1981)." Rogers, *The Impairment of Secured Creditors' Rights in Reorganization; A Study of the Relationship between the Fifth Amendment and the Bankruptcy Clause,* 96 Harv.L.Rev. 973, 996 n. 84 (1983).

**21.** S.Rep. No. 95–989, 95th Cong., 2d Sess. 63 (1978), *reprinted in* 1978 U.S.Code Cong. & Ad. News 5787, 5849.

**22.** *In re Pine Lake Village Apartment Co.*, 19 B.R. 819, 826 (Bkrtcy.S.D.N.Y.1982).

**23.** *Cf. In re Callister,* 15 B.R. 521, 531 (Bkrtcy.D. Utah 1981): "Under 11 U.S.C. Section 506(b) when a creditor is oversecured, this [charges for creditor-purchased insurance on the collateral] supplements the allowed secured claim, *increasing the lien entitled to protection."* (Emphasis added.) *See also In re BBT,* 11 B.R. 224, 232 n. 13 (Bkrtcy.D.Nev.1981): "In such [a] case where value exceeds debt the interest on the security is also protected."

**24.** "This section [506(b)] entitled him [the oversecured creditor] to collect interest on his claim so that whatever interest accumulates during the interim prior to confirmation *will be added to his secured claim ....*" *In re Pine Lake Village Apartment Co.,* 19 B.R. 819, 828 (Bkrtcy.S.D.N.Y.1982) (emphasis added).

**25.** Although the superior rights of a secured creditor are an express part of the Bankruptcy Code, whether this deferential treatment is founded on a sound Constitutional basis is the subject of continuing discussion. *See* Rogers, *The Impairment of Secured Creditors' Rights in*

does not mean that the holder of an allowed unsecured claim is totally at the mercy of the bankruptcy process. The Code itself provides such a creditor with a variety of means designed to protect his or her interest.[26]

In light of the above, while it is true that NFT's allowed unsecured claim of $28,094.01 was not entitled to adequate protection, and also true that NFT's allowed secured claim of $51,114.66 was not entitled to post-petition interest, charges, costs and fees, the fact remains that this dissipating $51,114.66 claim was entitled to adequate protection. Thus, the stipulation was not the product of mutual mistake or error, even though parts of it are unenforceable,[27] but served a valid, statutorily-recognized purpose.

### III.

Having resolved affirmatively the question of whether the stipulation as executed was legally well-founded, it must now be determined whether its implementation comported with due process. Former Bankruptcy Rule 919(a),[28] applicable when NFT filed its motion for adequate protection, provided that "[o]n application by the trustee or receiver and after hearing on notice to the creditors as provided in Rule 203(a) [10-day notice] and to such other persons as the court may designate, the court may approve a compromise or settlement." Interim Bankruptcy Rule 2002(b) then required at least a 20-day notice [29] to all parties in interest of a "hearing on approval of a compromise or settlement of a controversy." Absent compliance with these requirements of notice, hearing, and court approval, a purported settlement or compromise is unenforceable. *In re Lloyd, Carr and Co.* 617 F.2d 882, 885 (1st Cir. 1980). What is a "controversy"? In *Matter of Towers Magazines, Inc.* 27 F.Supp. 693 (M.D.Pa.1939), *cited in* 2A *Collier on Bankruptcy* ¶ 27.02 at 1084 n. 10 (14th ed. 1978), the court held that a suit need not have been filed as a predicate to a compro-

*Reorganization: A Study of the Relationship between the Fifth Amendment and the Bankruptcy Clause,* 96 Harv.L.Rev. 973 (1983); Murphy, *Use of Collateral in Business Rehabilitations: A Suggested Redrafting of Section 7–203 of the Bankruptcy Reform Act,* 63 Cal.L.Rev. 1483 (1975); Murphy, *Restraint and Reimbursement; The Secured Creditor in Reorganization and Arrangement Proceedings,* 30 Bus.Law 15 (1974).

26. "Although it is true that an undersecured creditor does not recover interest on his claim and thus would ultimately receive no compensation for the interim period, this cannot be construed as unfair since 11 U.S.C. § 506(b) makes no provision for interest to be added to the secured claim of an undersecured claimant. Indeed, the proper remedy to be afforded secured claim holders for undue delay in realizing their claims would lie in a motion to dismiss the Chapter 11 petition or convert it to a Chapter 7 case under § 1112(b), should the debtor be unable to effectuate a reorganization plan within a reasonable time."
*In re Pine Lake Village Apartment Co.,* 19 B.R. 819, 838 (Bkrtcy.S.D.N.Y.1982). Also, generally once the debtor's exclusive period has expired, any creditor may propose a plan or reorganization in order to expedite the reorganization process. 11 U.S.C. § 1121(c). Of course, a prudent creditor will not wait until a petition is filed to protect itself against the risks of bankruptcy. "[T]hey may insist on an interest premium on the original loan .... [Or] ... they may obtain sufficient collateral to ensure that they will remain fully secured if the debtor files a petition in bankruptcy ...." Comment, *Compensation for Time Value as Part of Adequate Protection During the Automatic Stay in Bankruptcy,* 5 U.Chi.L.Rev. 305, 307 n. 15 (1983).

27. The stipulation appears to grant NFT post-petition interest and other costs. Of course, if there is no legal right to such interest and costs, the stipulation will not be so enforced to the detriment of the other creditors.

28. Rule 919 was superceded by current Bankruptcy Rule 9019(a) (effective 1 August 1983), which reads: "On motion by the trustee and after a hearing on notice to creditors, the debtor and indenture trustees as provided in Rule 2002(a) and to such other persons as the court may designate, the court may approve a compromise or settlement." Former Rule 919(a) provided the procedure for § 27 of the former Bankruptcy Act, 11 U.S.C. § 50 (repealed 1979), which read: "The receiver or trustee may, with the approval of the court, compromise any controversy arising in the administration of the estate upon such terms as he may deem for the best interest of the estate."

29. Since NFT's notice was sent 30 days before the hearing, the Court need not decide if the 10-day or 20-day notice requirement controlled.

mise [under old Bankruptcy Act § 27], and that a "controversy" may be nothing more than a disagreement. Most frequently, compromises and settlements concern claims filed against or on behalf of the estate. Certainly the debtors and NFT had a disagreement. On the other hand, this stipulation may perhaps be viewed more accurately as the vindication of a statutory right—the provision of adequate protection—and not a settlement in the usual sense. For the purpose of argument only, the Court assumes, without deciding, that the stipulation involved here was in the nature of a settlement of a controversy, but concludes that, under the circumstances, the purpose of the notice and hearing requirement [30] was met by NFT; therefore, the stipulation and trust deed are valid.

█ Because a request for adequate protection of a creditor's allowed secured claim may involve the use of estate property,[31] all interested parties notified of such a motion and its accompanying hearing are or should be on notice that their pecuniary interests may be adversely affected at such a hearing. After all, the Bankruptcy Code treats adequate protection of an allowed secured claim as being paramount to the interests of creditors holding allowed unsecured claims. Interim Rule 2002(b) was not designed to provide more due process than this—notification of the time and place to be heard. The provision of adequate protection to holders of allowed secured claims would be unduly complicated and protracted if, after the initial notice and hearing and the debtor's offer of ade-

quate protection, a second "compromise" hearing was required upon 20-day notice. Such a delay is neither contemplated nor required by the Bankruptcy Code or Rules. Here, the creditors were notified of the hearing, the essence of the stipulation was orally placed on record, and no objections or comments were offered by any interested third party. Moreover, interested parties have no reason to complain of or challenge the debtors' provision of adequate protection of a decreasing allowed secured claim because the creditor would be entitled to a § 507(b) superpriority to the extent there was an unprotected decrease in the secured claim. Indeed, because of the preferred position of secured creditors, it might be argued that notice to other creditors of a bare adequate protection hearing is not required because such third parties are already "on notice." [32]

█ However, if something more than mere adequate protection of an allowed secured claim is contemplated by a stipulation, then all interested parties must be notified of what is proposed and given an opportunity to voice their objections. For example, if a creditor requires an additional lien on unencumbered estate property to ensure the payment of an unsecured prepetition claim,[33] to secure the advance of new capital [34] or to grant the debtor forebearance for use of collateral, then such a proposed course of action goes beyond what a third-party holder of an unsecured claim could reasonably expect at an adequate protection hearing. As interpreted here, the effect of the stipulation was to

---

**30.** Under pre-Code practice and now, "the only purpose of the notice is to give creditors an opportunity to be heard." 3 COLLIER ON BANKRUPTCY ¶ 58.11 at 531 (14th ed. 1977). "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950).

**31.** E.g., estate property could be encumbered by an additional lien or expended in the form of

cash payments. *See* 11 U.S.C. §§ 361, 541, and 1306 (Chapter 13 only).

**32.** More commonly, adequate protection of an allowed secured claim is provided in the context of a lift stay hearing convened pursuant to Bankruptcy Rules 4001 and 9014. It would be a rare circumstance indeed if any but the movant (creditor) and debtor received notice of and participated in such a hearing.

**33.** *See In re Texlon Corp.,* 596 F.2d 1092 (2d Cir.1979).

**34.** 11 U.S.C. § 364.

provide adequate protection of NFT's allowed secured claim only as of the petition date.

### IV.

 Having concluded that the trust deed is valid (because the stipulation providing for it is valid), the second cause of the debtors' complaint (objection to claim) must be addressed. In light of the discussion above, the Court fixes the amount of NFT's allowed secured claim at $51,114.66 and its allowed unsecured claim at $28,094.01. To the extent that FIB's increasing · allowed secured claim eroded the amount of NFT's allowed secured claim, that difference between the claim's petition date amount and the foreclosure date amount will be secured by the trust deed on the undeveloped lot. NFT has presented a figure of $13,990, uncontested by the debtors, which allegedly represents the amount of post-petition interest on FIB's claim from 1 June 1982 until 25 May 1983 (foreclosure sale). This figure would place the total amount of FIB's allowed secured claim as of the sale at $122,875.34.[35] The subtraction of FIB's allowed secured claim from the adopted value of $160,000.00 would leave NFT with security worth only $37,124.66, $13,990 less than the original value of its allowed secured claim. It is this $13,990 amount that was protected by the stipulation and is now secured by the trust deed on the lot.[36] In addition, NFT shall be entitled to a prorata portion of any interest earned on the lot sale proceeds.

### Conclusion

A separate judgment shall be entered concurrently herewith. This Memorandum Decision shall constitute Findings of Fact and Conclusions of Law as required by Bankruptcy Rule 7052.

**35.** No other evidence of FIB's entitlement to other § 506(b) amounts, such as fees and costs, has been presented to the Court.

**36.** Because the adequate protection of NFT's allowed secured claim was not lacking, the discussion of NFT's right to a § 507(b) superiority administrative expense is unnecessary.